```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

          - v. -                  :    INFORMATION

STATOIL, ASA,                     :    06 Cr.

               Defendant.         :

- - - - - - - - - - - - - - - - -x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: OCT 13 2006

06 CRIM. 960

COUNT ONE

(Violation of the Foreign Corrupt Practices Act)

The United States Attorney charges:

Background

1.  The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, 15 U.S.C. §§78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of obtaining or retaining business for, or directing business to, any person.

2.  At all times relevant to this Information:

    a.  Defendant STATOIL, ASA ("STATOIL") was a public company organized under the laws of the Kingdom of

Norway and headquartered in Stavanger, Norway. STATOIL explored for, developed, produced and sold oil and natural gas resources around the globe. The company had American Depositary Shares that traded under the symbol "STO" on the New York Stock Exchange and were registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78(g)). Accordingly, STATOIL was an "issuer" within the meaning of the FCPA, 15 U.S.C. §78dd-1. As an issuer, STATOIL was required to file reports with the U.S. Securities & Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. §78m).

    b. Under the supervision of its Chief Executive Officer ("the CEO"), defendant STATOIL undertook to pursue opportunities to expand its business internationally. STATOIL held participation interests in several exploration and production licenses outside of Norway, but acted as an operator of only a few small fields outside of Norway. As part of this effort to expand its international business, STATOIL hired and employed a senior executive to direct its International Exploration and Production Department ("the Senior Executive"), who reported directly to the CEO.

    c. Defendant STATOIL focused on Iran as a country in which to secure operatorships. The Iranian Ministry of Oil, through the National Iranian Oil Company ("NIOC") and

various wholly-owned companies, controlled the rights to develop the oil and gas resources of Iran.

        d.    The South Pars oil and gas field in Iran was one of the largest natural gas fields in the world. Iran awarded contracts for the development of that field in phases.

        e.    The Iranian Fuel Consumption Optimizing Organization ("IFCOO"), a subsidiary of NIOC, was headed by an Iranian government official ("the Iranian Official"). The Iranian Official's father was a former president of Iran who led the Expediency Council, a body that mediated between the politically-elected and the clerically-controlled parts of Iran's government.

        3.    In November 2000, NIOC and defendant STATOIL entered into a Cooperation Agreement which identified areas of mutual interest for future cooperation between STATOIL and NIOC. In the spring of 2001, certain STATOIL employees in Iran met with the Iranian Official. After learning the identity of the Iranian Official's father, STATOIL undertook to test the Iranian Official's influence. A STATOIL employee described the test as demonstrating that the Iranian Official was "powerful" and was the "link" to opportunities to obtain business in Iran. STATOIL determined that the Iranian Official was an advisor to Iran's Oil Minister, and that the Iranian Official's family was powerful and

highly influential in the oil and gas business in Iran.

4.   In August 2001, the Iranian Official visited defendant STATOIL's facilities in Norway, and met with senior STATOIL employees, including a chief adviser to the CEO, the Senior Executive, and a senior employee in STATOIL's International Exploration and Production Department who had direct responsibility for STATOIL's activities in Iran (the "E&P Executive").  The Iranian Official's position and influence were known to the members of STATOIL management who participated in this meeting, and internal STATOIL memoranda prepared at the time described the Iranian Official's family as "control[ling] all contract awards within oil and gas in Iran."

### The Bribery

5.   In the second half of 2001 and into 2002, the Senior Executive discussed with the CEO the possibility of entering into a consulting contract to arrange payments to the Iranian Official, and began negotiating the terms with the Iranian Official.  In November 2001, Iranian authorities proposed that defendant STATOIL consider seeking a participation interest in a subcontract to develop three phases of the South Pars oil and gas field ("the South Pars Project"), under a contract awarded to an Iranian oil and gas development company (the "Development Company") that was indirectly owned and controlled by the Iranian Ministry of Oil.

6.   In December 2001, the Iranian Official sent a sample consulting contract and payment proposal to the Senior Executive, which the Iranian Official represented had previously been used in his dealings with certain other multinational oil companies.  In January 2002, the Senior Executive described the Iranian Official's proposal to the CEO.  The proposal required STATOIL to (i) pay the Iranian Official a "success fee" upon STATOIL's being awarded a participation interest in the development of the South Pars Project; (ii) provide money for "charities" of the Iranian Official's choice; and (iii) make payments through an offshore company.

7.   Although the CEO objected to the proposal as presented, he ultimately approved defendant STATOIL's entering into a consulting contract ("the Consulting Contract") that obligated STATOIL to pay the Iranian Official a total of $15.2 million over approximately 11 years; the contract called for initial payments of $200,000 and $5 million, and ten subsequent annual payments of $1 million each.  The Consulting Contract was structured as a payment for vaguely-defined consulting services through an off-shore intermediary company ("the Consulting Company") owned by a third party located in London, England.  The purpose of the Consulting Contract -- which intentionally did not name the Iranian Official -- was to induce the Iranian Official to use his influence to: (i) assist STATOIL in obtaining

a contract to develop three phases of the South Pars Project; and (ii) open doors to additional projects in the Iranian oil and gas exploration industry.

8. On May 15, 2002, defendant STATOIL and the Development Company entered into an agreement in principle that provided the central terms for STATOIL's participation in the offshore portion of the Development Company's contract for the South Pars Project. At that time, it was contemplated that the contract for development of the South Pars Project would be finalized by June 15, 2002.

9. On June 12, 2002, the E & P Executive, acting on a power of attorney from the CEO, signed the Consulting Contract on behalf of defendant STATOIL. The Senior Executive believed that STATOIL would be awarded a participation interest in the development of the South Pars Project.

10. In late June 2002, defendant STATOIL received an invoice from the Consulting Company instructing it to pay $200,000 under the terms of the Consulting Contract, and instructing that the money be routed through a United States bank in New York, New York to a bank account in Switzerland held by a company not named in the Consulting Contract, and previously unknown to STATOIL. STATOIL made the payment on June 26, 2002, according to the instructions in the invoice.

11. In return for the payments called for by the

Consulting Contract, the Iranian Official used his influence to assist defendant STATOIL in obtaining the contract to develop the South Pars Project. Among other things, the Iranian Official provided STATOIL employees in Iran with nonpublic information concerning oil and gas projects in Iran, and showed STATOIL copies of bid documents of competing companies, which STATOIL could not access through appropriate channels.

12. In October 2002, defendant STATOIL obtained the contract to develop the South Pars Project. STATOIL and the Development Company signed a Participation Agreement which STATOIL expected would yield millions of dollars in profit.

13. In December 2002, defendant STATOIL received a second invoice from the Consulting Company instructing it to pay $5 million, with payment instructions identical to those in the June 2002 invoice. On January 15, 2003, STATOIL paid $5 million pursuant to the instructions in the invoice, through a United States bank in New York, New York. No additional payments were made under the Consulting Contract, which was later terminated.

### The Improper Characterization of Payments Made Under The Consulting Contract

14. Defendant STATOIL failed properly to account for the illegal payments to the Iranian Official and failed accurately to describe the Consulting Contract in its books and records. Instead, STATOIL improperly characterized the payments

it made as legitimate payments for "consulting fees for special consultants and analyses relating to technical, administrative, tax, and financial matters," and improperly characterized the Consulting Contract as an ordinary consulting agreement.

### Statutory Allegations

15.  From in or about June 2002, through in or about January 2003, in the Southern District of New York and elsewhere, STATOIL, the defendant, an issuer which has a class of securities registered pursuant to Title 15, United States Code, Section 781 used means and instrumentalities of interstate commerce, corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of money to a foreign official for purposes of influencing the acts and decisions of such foreign official in his official capacity, inducing said foreign official to do acts in violation of his lawful duty, securing an improper advantage; and inducing such foreign official to use his influence with a foreign government and instrumentality thereof to affect or influence an act or decision of such government and instrumentality; to wit, STATOIL wire-transferred $5.2 million to the Iranian Official through a United States bank in New York, New York to induce him to use his influence with NIOC and the Iranian Oil Ministry, and thereby assist STATOIL in obtaining a contract to develop the South Pars Project, and to secure an

improper advantage for STATOIL by positioning STATOIL to obtain future business in Iran.

(Title 15, United States Code, Section 78dd-1(a)).

## COUNT TWO

(Falsifying Books and Records)

The United States Attorney further charges:

16. Paragraphs 1 through 14 of this Information are repeated, realleged, and incorporated by reference herein as if fully set forth in this Count.

17. From in or about June 2002 through in or about January 2003, in the Southern District of New York and elsewhere, STATOIL, the defendant, unlawfully, wilfully and knowingly, directly and indirectly, falsified and caused to be falsified books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of STATOIL, an issuer within the meaning of the Foreign Corrupt Practices Act; to wit, STATOIL failed properly to account for $5.2 million in illegal payments to the Iranian Official, and falsely characterized those payments in its books and records as legitimate payments for "consulting fees for special consultants and analyses relating to technical,

administrative and tax matters."

    (Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff)

*Michael J. Garcia*
MICHAEL J. GARCIA
United States Attorney

STEPHEN A. TYRRELL
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*Mark F. Mendelsohn*
MARK F. MENDELSOHN
Deputy Chief, Fraud Section